KRIEGER et al., Appellees and Cross–Appellants,

v.

CLEVELAND INDIANS BASEBALL CO. et al., Appellants and Cross–Appellees.

[Cite as *Krieger v. Cleveland Indians Baseball Co.*, 176 Ohio App.3d 410, 2008-Ohio-2183.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 89314, 89428 and 89463.

Decided May 8, 2008.

412

416

Burke, Vannucci & Gallagher, James W. Burke Jr., and John J. Chambers; and Sean P. Allen, for appellee and cross-appellant Clifton Oliver.

John J. Spellacy; and Sean P. Allen, for appellee and cross-appellant Donald Krieger.

Robert J. Triozzi, Director of Law, and Jerome A. Payne, Assistant Director of Law, for appellant and cross-appellee the city of Cleveland.

CHRISTINE T. MCMONAGLE, Presiding Judge.

{¶ 1} Defendant-appellant, the city of Cleveland ("the city") appeals from the trial court's judgment of compensatory damages, attorney fees, and prejudgment interest against the city. Appellees and cross-appellants Donald Krieger and Clifton Oliver cross-appeal from the trial court's order vacating the punitive-damages award and its award of $50,000 in attorney fees. We affirm in part and vacate in part.

## I.  THE FACTS

{¶ 2} The unrebutted testimony of appellees' witnesses at trial reflects the following.[1] On June 11, 2002, Krieger and Oliver were part of a group that attended a Cleveland Indians baseball game at Jacobs Field (now Progressive Field). Oliver's sister had won free tickets to the game; the seats were in the "nosebleed" section of right field, in the upper deck.

{¶ 3} The group, which included Krieger, Oliver, Oliver's sister, Andrew Mendez, and another woman, arrived at the game in the first inning. Krieger was dissatisfied with the seats, because they were so far away from the field. Shortly after arriving, Krieger saw some open seats in the lower deck, near third base, and left the group to sit there. Oliver, an active-duty Marine home on convalescence leave due to cervical fractures, joined Krieger several innings later, and the two remained there until the top of the ninth inning.

{¶ 4} With the Indians winning 5–0 in the top of the ninth inning, Krieger and Oliver left their seats, intending to reunite with their group in the upper deck. While they were near a lower-deck restroom, they heard an explosion and immediately headed toward the noise. By the time they arrived, the noise had drawn a large crowd, so they headed upstairs to find their friends.

{¶ 5} When they reached the group in the upper-deck area, security personnel were questioning Mendez, because it was thought that an explosive device had been dropped from the right-field upper-deck area.

{¶ 6} Cleveland police officers and Jacobs Field security personnel stopped, questioned, and searched Krieger, Oliver, and Mendez twice in the upper deck, and again as they walked down the ramp to leave, to determine whether they had any knowledge of the incident. Each time, Krieger and Oliver fully cooperated, answered the same questions, showed their tickets and identification, and consented to be searched. However, after the third such encounter, the men decided

---

1. The city called only one witness, former Cuyahoga County prosecutor Edward Fitzgerald, to testify at trial. Fitzgerald's testimony related mostly to the grand jury indictment, not to the events at Jacobs Field that precipitated this case.

to lodge a complaint with the Indians customer-service department about the way they had been treated.

{¶ 7} As they arrived at the customer-service area, they were confronted by seven or eight uniformed Cleveland police officers, who escorted the group to a room in the basement of Jacobs Field and immediately began berating the men. After handcuffing Krieger, the police put the men in holding cells. The police then questioned Oliver. Although he cooperated and answered every question, the police berated him, called him a "piece of s— Marine" and accused him of being a terrorist. Before being handcuffed, Oliver, who was wearing a hard plastic cervical collar and had limited range of motion in his neck due to his injuries, asked if he could be handcuffed in front, rather than behind his back. The police ignored his request, handcuffed him behind his back, and then shoved him in the back seat of a police cruiser with Krieger and Mendez for transport to jail.

{¶ 8} The police then confiscated Krieger's and Oliver's clothes and gave them paper jumpsuits to wear. They were then placed in separate jail cells and held for four days without being charged with a crime. The cells were filthy and infested with cockroaches, and each cell contained only a toilet. The men were not given a mattress, pillow, blanket, or even a chair. Krieger had to sleep on the ground and stuff toilet paper in his ears to keep out the insects. Oliver, who could not lie down because of his cervical neck collar, was forced to sit in the corner of the cell. Neither man was permitted to shower or brush his teeth.

{¶ 9} During their four days of confinement, Krieger and Oliver were harassed by the guards, who referred to them as terrorists and the "unibomber." Krieger feared for his life, because he been placed in a cell with a mentally unstable person who pounded the walls. He also suffered sleep deprivation, because the guards would wake him up repeatedly during the night. He sustained numerous insect bites and lost approximately 12 pounds.

{¶ 10} While they were incarcerated, Krieger and Oliver were separately interrogated by Cleveland Police Detective Ralph Peachman. Both Krieger and Oliver denied any knowledge of the source of the explosive device and explained, again, that they were in the lower-deck area of the stadium when the blast occurred. Detective Peachman told both Krieger and Oliver that he knew they did not have anything to do with setting off the explosive device, and he offered to release them from custody immediately if they would give him a statement implicating Mendez. Both Krieger and Oliver indicated that they could not implicate Mendez, because they knew nothing about the origin of the explosive device and were nowhere near Mendez when the explosion occurred.

{¶ 11} On June 14, 2002, after being held for nearly four days, Krieger and Oliver were each charged with three counts of aggravated arson and felonious assault, charges that collectively carried potential jail time of 70 years in prison.

{¶ 12} Prior to the bond hearing on June 15, 2002, Krieger's lawyer, William McGinty, met with Detective Peachman. According to McGinty, Detective Peachman told him that he knew Krieger "had nothing to do with this case," and, if Krieger would give a statement implicating Mendez, the city would drop the charges against him. Krieger told McGinty that he was innocent and could not implicate Mendez because he had no knowledge of his involvement. McGinty communicated Krieger's response to Detective Peachman, who told McGinty that he would then ask the judge to set a high bond.

{¶ 13} Detective Peachman likewise told Oliver's attorney and his father that he knew Oliver had nothing to do with the explosion, but he wanted him to testify against Mendez. Oliver refused to do so because he, too, knew nothing about Mendez's involvement and was not near Mendez when the explosion occurred.

{¶ 14} During the bond hearing, Detective Peachman testified that he considered Krieger and Oliver to be terrorists, and, with no evidence to support his assertion, testified that Oliver had procured a military explosive device from the Marine Corps. Detective Peachman requested that the judge set a bond of $1,000,000. Representatives from television and print media attended the hearing and subsequently reported that Krieger and Oliver were terrorists.

{¶ 15} After posting bond, Krieger and Oliver were released from jail. Several weeks later, after Detective Peachman testified to the grand jury, Krieger and Oliver were each indicted on four counts of aggravated arson and felonious assault.

{¶ 16} Krieger and Oliver continued to maintain that the video surveillance tapes from the game would exonerate them. When the prosecutor finally released the surveillance tapes to their lawyers months later, the tapes confirmed that Krieger and Oliver were in the lower deck when the blast occurred. Additionally, the results of forensic analysis by the Bureau of Alcohol, Tobacco and Firearms indicated the absence of bomb residue on Krieger's and Oliver's clothing. Despite this evidence, Detective Peachman still refused to recommend that the charges be dismissed, unless Krieger and Oliver gave a statement against Mendez. Finally, on January 29, 2003, one week prior to trial, the prosecutor's office dismissed the charges against Krieger and Oliver without prejudice.

{¶ 17} By this time, the weight of the charges had taken a toll on both Krieger and Oliver. After being released from jail, Krieger, who was 27 years old, experienced nightmares about his incarceration and, for a time, had to sleep in

his parents' bedroom. He received threatening phone calls and was harassed by the media and branded a terrorist. Oliver's parents were forced to borrow the money for their son's bond on a credit card. Cleveland police apparently called Oliver's commanding officer while he was incarcerated, and when Oliver, who had a flawless military career to this point, called his battalion gunnery sergeant to tell him what had happened, he was told that he was an "embarrassment to the Marine Corps and a black eye to [his] battalion." His military career was ruined. Due to the extensive media coverage, Oliver was unable to obtain employment after the incident; he became depressed and had to take antidepressant medication.

## II. The Initial Lawsuit

{¶ 18} On June 10, 2003, Krieger and Oliver subsequently filed two separate actions (which were later consolidated) against the Cleveland Police Department, the Cleveland Indians Baseball Organizations, Detective Peachman, and several other officers, alleging false imprisonment, malicious prosecution, slander, negligence, and intentional infliction of emotional distress. The docket reflects that a summons and complaint were sent by certified mail to the police department on June 16, 2003; service was returned on June 18, 2003, showing that the police department had refused service. Nevertheless, on July 31, 2003, the police department filed its answer, setting forth the affirmative defenses of insufficiency of process and that the police department is not a sui juris entity that can be sued. Appellees subsequently dismissed their claims without prejudice on June 30, 2004. On the same day, a special process server delivered a summons and complaint to the police department.

## III. The Refiling

{¶ 19} On June 29, 2005, Krieger and Oliver refiled their complaint, alleging the same claims against the same parties as before. The police department subsequently filed a motion to dismiss on the grounds that it is not a sui juris entity and lacks the capacity to be sued. In response, appellees moved the court to amend their complaint to name the city of Cleveland as a defendant. The trial court subsequently granted appellees' motion.

{¶ 20} The trial court also denied the city's motion for summary judgment, made on the grounds that appellees' claims were barred by the applicable statute of limitations, and its motion for reconsideration of the trial court's ruling. Appellees subsequently dismissed all parties except the city; trial proceeded against only the city.

{¶ 21} At trial, the jury found in favor of Krieger and Oliver on their claims of malicious prosecution, false imprisonment, and intentional infliction of emotional

distress[2] and awarded compensatory damages in the amount of $400,000 and $600,000 in punitive damages to each appellee.

{¶ 22} After the jury's award, the city filed motions for a directed verdict and a new trial, and appellees filed motions for prejudgment interest and attorney fees. After a hearing, the trial court entered judgment for each appellee in the amount of $400,000 in compensatory damages, $50,000 in attorney fees, and $144,102.08 in prejudgment interest. The trial court vacated the punitive-damages award. Both the city and appellees now appeal.

## IV. Immunity for the City

{¶ 23} The city first argues that the trial court erred in denying its motion in limine to exclude evidence of intentional torts, motion for directed verdict, and motion for a new trial, because, as a political subdivision, under R.C. Chapter 2744, Ohio's Political Subdivision Tort Liability Act, it is immune from liability for intentional torts.

{¶ 24} We need not decide whether the city is immune from liability for its intentional torts in this case, because, for the reasons stated below, we find that the city abandoned the statutory immunity defense when it filed its amended answer.

{¶ 25} Statutory immunity is an affirmative defense that must be timely raised or it is waived. *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 97, 706 N.E.2d 1261, citing *State ex rel. Koren v. Grogan* (1994), 68 Ohio St.3d 590, 629 N.E.2d 446; Civ.R. 8(C); Civ.R. 12(H).

{¶ 26} In this case, the record demonstrates that appellees filed their complaint on June 29, 2005. The Cleveland Police Department subsequently filed a motion to dismiss on the grounds that it is not a sui juris entity that can be sued. In response, appellees filed a motion to amend their complaint to substitute the city for the police department as the proper defendant, which was granted on November 28, 2005. On December 29, 2005, the city filed an answer to appellees' amended complaint, in which it asserted that it was immune from liability. On March 17, 2006, Detective Peachman filed his answer, also asserting immunity.

{¶ 27} In the meantime, on January 6, 2006, the city filed a motion for summary judgment, arguing that appellees' complaint was barred by the statute of limitations. The motion did not raise the issue of statutory immunity.

{¶ 28} On April 28, 2006, the city and Peachman filed a motion for leave to amend their answers to appellees' amended complaint "to assert two additional

---

2. Appellees' slander and negligence claims were dismissed.

affirmative defenses" relating to Oliver's bankruptcy proceeding. After the motion was granted, the city and Peachman filed their amended answer on June 12, 2006. With respect to immunity, the city's and Peachman's amended answer states only that "Peachman is immune from liability pursuant to, but not limited to, Revised Code Chapter 2744, 4765 and Ohio common law." The city's purported immunity is not pleaded anywhere in its amended answer.

{¶ 29} The law relevant to the city's amended answer was set forth in *Grimm v. Modest* (1939), 135 Ohio St. 275, 277, 14 O.O. 121, 20 N.E.2d 527:

{¶ 30} " '[It] is elementary law that when a party substitutes an amended petition for an earlier one, this constitutes an abandonment of the earlier pleading and a reliance upon the amended one. The earlier pleading becomes *functus officio.*'" Id. at 277, 14 O.O. 121, 20 N.E.2d 527, quoting *State ex rel. Talaba v. Moreland* (1936), 132 Ohio St. 71, 75, 7 O.O. 195, 5 N.E.2d 159. See also *Wrinkle v. Trabert* (1963), 174 Ohio St. 233, 238, 22 O.O.2d 248, 188 N.E.2d 587 (effect of filing an amended petition omitting a party as defendant was to abandon the action as to that party).

{¶ 31} Here, the city was clearly aware of the immunity defense, because it asserted statutory immunity in its first answer to appellees' amended complaint. Nevertheless, it did not argue immunity in its motion for summary judgment. In fact, the city did not raise the issue of statutory immunity for intentional torts until October 26, 2006, in a motion in limine filed shortly before trial.

{¶ 32} Likewise, the city's motion for leave to amend its answer to assert additional defenses indicates the city's awareness of affirmative defenses to appellees' amended complaint. But, although the city's original answer asserted immunity from liability, when the city filed its amended answer, it did not assert its own statutory immunity as an affirmative defense. It asserted immunity only for Detective Peachman.

{¶ 33} In light of the city's failure to raise statutory immunity in its motion for summary judgment and its failure to plead it as an affirmative defense, we hold that the city waived any statutory immunity defense it might have had. Cf. *Turner,* supra, 85 Ohio St.3d at 98, 706 N.E.2d 1261. ("It was perfectly reasonable for appellants to assume that in the absence of [appellee's] failure to assert this defense, and its failure to argue this issue in its first motion for summary judgment, it intended to waive the defense.") Therefore, the trial court did not err in denying the city's motion in limine, motion for directed verdict, and motion for new trial, all of which were made *after* the city had abandoned its statutory immunity defense.

{¶ 34} Appellant's first assignment of error is overruled.

## V. The Statute of Limitations

{¶ 35} In its second assignment of error, the city argues that the trial court erred in denying its motion for summary judgment, motion for reconsideration, motion for directed verdict, and motion for a new trial, because appellees' suit is barred by the applicable statute of limitations. Specifically, the city contends that appellees' first suit was never commenced against the police department and, therefore, the city did not become a party to the suit until after expiration of the applicable statute of limitations. Additionally, the city argues that Civ.R. 15(C) is not applicable to allow appellees to amend their refiled complaint to substitute the city for the police department as the proper defendant, because appellees never commenced their first action against the police department. The city's argument fails.

{¶ 36} Under Civ.R. 3(A), "[a] civil action is commenced by filing a complaint with the court, if service is obtained within one year from such filing * * *."

{¶ 37} Appellees filed their first complaint on June 10, 2003, within the applicable statutes of limitations. Appellees then attempted to commence their action against all defendants, including the police department. On June 16, 2003, a summons and complaint was sent to the police department by certified mail, but it was returned on June 18, 2003, marked "[r]efused." On June 30, 2004, appellees voluntarily dismissed their complaint without prejudice. On June 29, 2005, less than one year later, they refiled their complaint.

{¶ 38} Ohio's savings statute, R.C. 2305.19(A), states that "[i]n any action that is commenced *or attempted to be commenced*, if in due time a judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon the merits, the plaintiff * * * may commence a new action within one year after * * * the plaintiff's failure otherwise than upon the merits or within the period of the original applicable statute of limitations, whichever occurs later." (Emphasis added.)

{¶ 39} As a remedial statute, R.C. 2305.19(A) should be construed liberally so that cases may be decided upon their merit, rather than upon technicalities or procedure. *Cero Realty Corp. v. Am. Mfrs. Mut. Ins. Co.* (1960), 171 Ohio St. 82, 12 O.O.2d 92, 167 N.E.2d 774, syllabus; *Kavouras v. Hurt* (Apr. 30, 1992), Cuyahoga App. No. 60427, 1992 WL 90727.

{¶ 40} As this court has recognized, "[t]he applicability of R.C. 2305.19 is not limited only to circumstances where effective service of process has been obtained. By its express language, the savings statute also applies where there has been an attempt to commence an action." *Abel v. Safety First Industries, Inc.,* Cuyahoga App. No. 80550, 2002-Ohio-6482, 2002 WL 31667308, at ¶ 42. See

also *Stone v. Adamini,* Cuyahoga App. No. 83159, 2004-Ohio-4466, 2004 WL 1899413, at ¶ 20.

{¶ 41} In the instant case, appellees attempted to commence their initial lawsuit against the police department by filing their complaint and demanding service prior to the expiration of the applicable statutes of limitations.[3] Additionally, a voluntary dismissal is a dismissal "otherwise than upon the merits." *Frysinger v. Leech* (1987), 32 Ohio St.3d 38, 512 N.E.2d 337, paragraph two of the syllabus; *Gardner v. Gleydura* (1994), 98 Ohio App.3d 277, 279, 648 N.E.2d 537. Thus, the city's argument that appellees' first action was never actually commenced against the police department is meaningless. In light of their attempt to commence their action and subsequent failure otherwise than upon the merits, appellees properly availed themselves of the savings statute when they refiled their complaint on June 29, 2005.

{¶ 42} Moreover, under Civ.R. 15(C), the trial court properly allowed appellees to amend their complaint to substitute the city for the police department as the proper defendant. Three conditions must be satisfied in order to prevail under Civ.R. 15(C). The party seeking to relate an amended pleading back to the date of an original pleading must demonstrate that (1) the claim asserted in the amended complaint arose out of the conduct, transaction, or occurrence set forth in the original complaint; (2) within the period provided by law for commencing the action against him, the party to be brought in by amendment received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) within the period provided by law for commencing the action against him, the party to be brought in knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against him.

{¶ 43} The three conditions are certainly satisfied here. The same claims were made in the first complaint as in the amended complaint, and the causes of action arose out of the same conduct by the city and its employees. Moreover, because both the first and second lawsuits were defended by the same lawyer from the city's law department, it is clear that the city received notice of the suit within the applicable statute of limitations and knew that but for appellees' mistake concerning the identity of the proper party, the suit would have been brought against it.

{¶ 44} This court has previously held that a refiled complaint relates back to the original filing if the requirements of Civ.R. 15(C) are met. See, e.g., *Rios v. Grand Slam Grille* (Nov. 18, 1999), Cuyahoga App. No. 75150, 1999 WL 1044506;

---

3. The delivery of the complaint and summons to the police department on June 30, 2004, by a special process server is irrelevant to our discussion, because appellees voluntarily dismissed their complaint the same day.

*Husarcik v. Levy* (Nov. 10, 1999), Cuyahoga App. No. 75114, 1999 WL 1024135. Because those conditions are met here, and because appellees properly utilized the savings statute to refile their complaint, notwithstanding their failure to perfect service of the original complaint on the police department, the trial court did not err in denying the city's various motions on this issue.

{¶ 45} Appellant's second assignment of error is therefore overruled.

## VI. Oliver's Bankruptcy Filing

{¶ 46} Appellees' first lawsuit was filed on June 10, 2003; it was voluntarily dismissed without prejudice on June 30, 2004. On April 12, 2005, prior to the refiling, Oliver filed a petition in bankruptcy in the United States Bankruptcy Court for the Northern District of Ohio. On June 29, 2005, the second lawsuit was filed. It is undisputed that the second suit did not include the trustee of Oliver's bankruptcy estate as a party and was initiated in Oliver's name only.

{¶ 47} The city argues that the trial court erred in denying its motion for directed verdict, motion for new trial, and motion in limine, because Oliver lacked standing after he filed for bankruptcy. Specifically, the city contends that due to his bankruptcy petition, Oliver was not the real party in interest with respect to his claims and, therefore, his claims should have been dismissed.

{¶ 48} Upon the commencement of a bankruptcy case, all of a debtor's property becomes property of the estate. 11 U.S.C. 541. The code broadly interprets "property" to include all interests of a debtor, whether they are legal or equitable, tangible or intangible. Id. This definition necessarily includes any unliquidated legal claims that a debtor may have against other parties. *McLynas v. Karr,* Franklin App. No. 03AP–1075, 2004-Ohio-3597, 2004 WL 1516849, at ¶ 13. When causes of action are property of the bankruptcy estate, they "constitute property rights which are vested solely in the trustee in bankruptcy and subject to his or her sole control. Accordingly, only the trustee * * * has standing to bring the claims * * *." *Folz v. BancOhio Natl. Bank* (S.D.Ohio 1987), 88 Bankr.149, 150.

{¶ 49} Before an Ohio court can consider the merits of a claim, the person seeking relief must establish standing to sue. *Ohio Contrs. Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088. If a party to an action is not the real party in interest, the party lacks standing to prosecute the action. *State ex rel. Jones v. Suster* (1998), 84 Ohio St.3d 70, 77, 701 N.E.2d 1002. But, under Civ.R. 17, a case is not to be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification, joinder, or substitution of the real party in interest. "Such ratification, joinder, or substitution shall have the same

effect as if the action had been commenced in the name of the real party in interest." Civ.R. 17. See also *Dallas v. Childs* (June 23, 1994), Cuyahoga App. No. 65150, 1994 WL 284991; *Marathon Farms v. Ritter* (Apr. 6, 1983), Brown App. No. 405, 1983 WL 4322.

{¶ 50} Prior to this case proceeding to trial, Oliver filed a motion to reopen his bankruptcy case to amend his schedules to include the lawsuit and make the bankruptcy trustee aware that the lawsuit constituted a potential asset of the estate. The trustee then asked the bankruptcy court for permission to employ appellees' counsel as counsel for the trustee in the action, and, in an entry authorizing employment of counsel, that permission was granted by the bankruptcy court. Accordingly, the trustee ratified the commencement of Oliver's causes of action, Oliver had the requisite standing to prosecute his claims, and the trial court therefore properly denied the city's motions.

{¶ 51} Appellant's third assignment of error is overruled.

## VII. Jury Instructions

{¶ 52} In its fourth assignment of error, the city argues that the trial court erred in failing to instruct the jury with respect to appellees' claim of malicious prosecution that a grand jury indictment results in a rebuttable presumption of probable cause. The record reflects that although the city objected to the lack of instruction on the alleged rebuttable presumption, the city never submitted a proposed jury instruction to the trial court.

{¶ 53} We review the trial court's failure to give the instruction under an abuse-of-discretion standard. *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443.

{¶ 54} To establish the tort of malicious prosecution, a plaintiff must prove: (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prior proceedings in the plaintiff's favor. *Criss v. Springfield Twp.* (1990), 56 Ohio St.3d 82, 84, 564 N.E.2d 440.

{¶ 55} The record reflects that the trial court instructed the jury on the elements of malicious prosecution as set forth above and as contained in Section 330.03 of the Ohio Jury Instructions regarding malicious prosecution. A review of Ohio Jury Instructions Section 330.03 reveals that the instruction does not contain any language concerning the alleged rebuttable presumption that the city argues for in this case. Instead, the comment to Section 330.03 provides that "[i]ndictment is evidence of probable cause and plaintiff must bring forth evidence to rebut." Neither the instruction nor the comment directs the court to advise the jury that a grand jury indictment creates a "rebuttable presumption" of probable cause. This court has previously held that a trial court does not abuse

its discretion in giving the standard charge in the Ohio Jury Instructions. *Youssef v. Parr, Inc.* (1990), 69 Ohio App.3d 679, 692, 591 N.E.2d 762. The city has cited no case law to support its proposition that a trial court abuses its discretion in failing to create its own jury instruction with respect to the alleged "rebuttable presumption" created by a grand jury indictment in a malicious-prosecution case when that language is not contained in the standard Ohio Jury Instructions charge.

{¶ 56} Moreover, appellees presented substantial evidence to overcome any presumption of probable cause flowing from the grand jury indictment. Specifically, appellees produced evidence in this case to demonstrate that the indictment resulted from the testimony of Detective Peachman. Former Cuyahoga County prosecutor Edward Fitzgerald, the only witness called by the city in this case, testified that Detective Peachman was likely the sole witness who presented the case to the grand jury hearing. Prior to that hearing, Detective Peachman had admitted to Krieger, Oliver, their respective attorneys, and Oliver's father that he knew that Krieger and Oliver had nothing to do with the incident at Jacobs Field. There is no evidence that the grand jury heard any testimony other than that of Detective Peachman, and it indicted both Krieger and Oliver for felonious assault and aggravated arson. A reasonable inference from the indictment and Detective Peachman's acknowledgement prior to the grand jury proceedings that he knew that Krieger and Oliver had nothing to do with this crime is that Detective Peachman misled the grand jury in order to obtain an indictment against appellees.

{¶ 57} "If one party relies on a presumption and his adversary introduces evidence of a substantial nature which counter-balances the presumption, it disappears." *Adamson v. May Co.* (1982), 8 Ohio App.3d 266, 270, 8 OBR 358, 456 N.E.2d 1212. In light of the unrebutted evidence produced at trial by appellees, there was no presumption in favor of the city arising from the grand jury indictment and, thus, no prejudice to the city from the trial court's failure to instruct the jury on any alleged rebuttable presumption.

{¶ 58} Appellant's fourth assignment of error is overruled.

## VIII. Punitive Damages

{¶ 59} The jury awarded punitive damages against the city in the amount of $600,000 to each appellee. The city subsequently filed a motion for directed verdict and a motion for new trial on the basis that it is not liable for punitive damages and the jury should not have been instructed on punitive damages. After a hearing, the trial court vacated the punitive-damages award.

{¶ 60} The city argues in its fifth assignment of error that the trial court erred in instructing the jury regarding punitive damages. This assignment of error is moot, because there is no judgment against the city for punitive damages.

{¶ 61} In their first assignment of error on cross-appeal, appellees assert that the trial court erred in vacating the punitive-damages award.

{¶ 62} Appellees concede that it is well established that municipalities are not liable for punitive damages. R.C. 2744.05(A); *Spires v. Lancaster* (1986), 28 Ohio St.3d 76, 28 OBR 173, 502 N.E.2d 614. But, under R.C. 2744.03(A)(6)(b), employees of political subdivisions can be individually liable, and thus subject to punitive damages, upon a showing of malice, bad faith, or wanton or reckless behavior. *Wilson v. Stark Cty. Dept. of Human Serv.* (1994), 70 Ohio St.3d 450, 452, 639 N.E.2d 105.

{¶ 63} Prior to trial, the city and appellees stipulated that Detective Peachman was acting in the course and scope of his employment as it related to this matter. In exchange for this stipulation, appellees dismissed Detective Peachman from the lawsuit. Appellees contend that "[t]he City's agreement to enter into the stipulation in exchange for [their] dismissing Detective Peachman from the lawsuit was tantamount to a contractual assumption of Detective Peachman's liability." Appellees argue that if Detective Peachman had remained as a defendant in the lawsuit and been found individually liable, the city, under its contract with the Cleveland Police Union, would have been contractually obligated to pay any damages (up to $1,000,000) awarded against Detective Peachman. Therefore, they contend, by virtue of the stipulation, the city contractually agreed to assume Detective Peachman's tort liability and, by implication, any liability for punitive damages. This argument has no merit.

{¶ 64} The stipulation, set forth in a letter dated May 23, 2006 from the city's attorney to appellees' lawyers, said nothing about assuming Detective Peachman's liability; it merely stated that the city stipulated that Detective Peachman, at all times relevant to the matter in dispute, was acting within the course and scope of his employment. There is nothing in the stipulation regarding an agreement to assume Detective Peachman's tort liability, and we decline to read such an implicit term into a very explicit stipulation.

{¶ 65} Because municipalities are not subject to punitive damages, the trial court did not err in vacating the punitive damages award.

{¶ 66} Appellant's fifth assignment of error is overruled as moot; appellees and cross-appellants' first assignment of error is overruled.

## IX. Statutory Cap on Compensatory Damages

{¶ 67} R.C. 2744.05(C)(1) limits the amount of noneconomic damages that can be awarded against a political subdivision to $250,000. The jury returned an award of compensatory damages of $400,000 for each appellee. Upon the return of the jury's verdict, the city moved the trial court to impose the statutory limit as provided in R.C. 2744.05(C)(1). The trial court denied the city's motion. In its sixth assignment of error, the city argues that the trial court's ruling was in error.

{¶ 68} In *Gladon v. Greater Cleveland RTA* (Mar. 10, 1994), Cuyahoga App. No. 64029, 1994 WL 78468, this court held that R.C. 2744.05(C)(1) violates the constitutional right to a jury trial, because it impairs the function of the jury to determine the amount of damages. This court further held that the statute violates constitutional guarantees of equal protection, because it creates arbitrary and irrational differing classifications between nonwrongful-death tort claimants and wrongful-death tort claimants. Accord *Richardson v. Bd. of Cty. Commrs.* (Dec. 4, 1996), Tuscarawas App. No. 95–AP–110114, 1996 WL 753188.

{¶ 69} In *Gladon v. Greater Cleveland RTA* (1996), 75 Ohio St.3d 312, 662 N.E.2d 287, the Ohio Supreme Court reversed this court's holding in *Gladon* without reaching the issue of the constitutionality of the statute. We find no Supreme Court cases that otherwise address the constitutionality of R.C. 2744.05(C), and accordingly, we follow our holding in *Gladon* finding the statute unconstitutional. Therefore, the trial court did not err in denying the city's motion to reduce the compensatory damages awards to $250,000.

{¶ 70} Appellant's sixth assignment of error is overruled.

## X. Attorney Fees

{¶ 71} After the jury returned a verdict in their favor, appellees moved the trial court to award them attorney fees. The city opposed appellees' motion. The trial court subsequently granted appellees' motion and awarded each party $50,000 in attorney fees.

{¶ 72} In its seventh assignment of error, the city argues that because there is no statutory authorization under R.C. Chapter 2744 authorizing attorney fees against a municipality, the trial court erred in awarding attorney fees to appellees. In their second cross-assignment of error, appellees contend that the trial court erred in reducing the amount of attorney fees requested by appellees. Ohio follows the general "American Rule," under which the prevailing party cannot recover attorney fees in the absence of express statutory authorization. *Sorin v. Bd. of Edn. of Warrensville Hts. School Dist.* (1976), 46 Ohio St.2d 177, 179, 75 O.O.2d 224, 347 N.E.2d 527. There is no provision under R.C.

Chapter 2744 that allows for recovery of attorney fees against a municipality. In the absence of such a provision, attorney fees may not be awarded against a municipality. *Banks v. Oakwood* (Oct. 11, 1990), Cuyahoga App. Nos. 57225 and 58020, 1990 WL 151662; *Franklin v. Columbus* (1998), 130 Ohio App.3d 53, 719 N.E.2d 592.

{¶ 73} Appellees concede that attorney fees are not generally recoverable against a municipality, but argue that this case is different because Detective Peachman would have been individually liable for attorney fees if he had remained a defendant in the case, the city assumed Detective Peachman's liability by virtue of the stipulation discussed earlier and, therefore, the city is liable for attorney fees. Appellees' argument fails, because, as discussed earlier, the stipulation was not a contractual assumption of Detective Peachman's liability by the city.

{¶ 74} Appellant's seventh assignment of error is sustained, and the award of attorney fees is vacated. Appellees' second cross-assignment of error is over-ruled.

## XI. Prejudgment Interest

{¶ 75} In its eighth assignment of error, the city contends that the trial court erred in awarding appellees prejudgment interest from the date their cause of action accrued.

{¶ 76} Under R.C. 1343.03(C)(1), interest on a judgment shall be ordered in a civil tort action that has not settled if the court determines at a hearing "that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

{¶ 77} "A party has not failed to make a good faith effort to settle under R.C. 1343.03(C) if he has 1) fully cooperated in discovery proceedings, 2) rationally evaluated his risks and potential liability, 3) not attempted to unnecessarily delay any of the proceedings, and 4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus. R.C. 1343.03(C) was enacted to "promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, citing *Kalain.*

{¶ 78} Under R.C. 1343.03(C), the phrase "failed to make a good faith effort to settle" is not equivalent to "bad faith." Id. A party may have failed to make a good-faith effort to settle even though he or she did not act in bad faith. Id. Whether a good-faith effort to settle a case has been made depends on whether the amount of the settlement offer was based on an objectively reasonable belief about the party's liability and a rational evaluation of the risk of exposure. *Andre v. Case Design, Inc.*, 154 Ohio App.3d 323, 2003-Ohio-4960, 797 N.E.2d 132, at ¶ 18.

{¶ 79} Whether a party's settlement efforts were made in good faith is a decision committed to the sound discretion of the trial court, *Moskovitz,* 69 Ohio St.3d at 659, 635 N.E.2d 331, and absent an abuse of discretion, the trial court's decision to award prejudgment interest should not be reversed on appeal. *Kalain,* 25 Ohio St.3d, at 159, 25 OBR 201, 495 N.E.2d 572. An abuse of discretion involves more than a difference in opinion. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 473 N.E.2d 264. The term "discretion" itself involves the idea of a determination made between competing considerations. Id. "In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." Id.

{¶ 80} Under this standard, we hold that the trial court properly awarded prejudgment interest to appellees. We begin by noting that the city made no settlement offer whatsoever, even though it is undisputed that Oliver and Krieger would have settled the case for $20,000 each. The city argues that it had no duty to make any offer to settle the case, because it had an "objectively reasonable belief" that "the City is immune from intentional torts, appellees' claims were outside the statute of limitations, appellee Oliver lacked standing, and the rebuttable presumption of probable cause created by a grand jury indictment was never overcome." None of these arguments have merit. As discussed above, the city is not immune, appellees' claims were within the applicable statutes of limitations, and Oliver had proper standing to sue. Additionally, appellees' evidence indeed overcame any presumption of probable cause created by the grand jury indictment (see our discussion infra regarding manifest weight of the evidence).

{¶ 81} Moreover, the record reflects that the city repeatedly raised its immunity and statute-of-limitations defenses by way of numerous pretrial motions (motion to dismiss, motion for summary judgment, motion for reconsideration, and motion in limine). Each time, the trial court denied the city's motions. Clearly, by the time the case proceeded to trial, the city was on notice that there

was a potential for liability in this case. Thus, the city's belief that it had no potential exposure in this case cannot be called "objectively reasonable."

{¶ 82} Moreover, the city did not attempt to reasonably assess its liability, even after the trial court had denied its motions. William McGinty, the key witness in this case, offered very damning testimony during his deposition, i.e., that Detective Peachman admitted to him, prior to the grand jury indictment, that he knew that neither Krieger nor Oliver had anything to do with the incident that gave rise to this case. However, no representative of the city bothered to attend McGinty's deposition to evaluate his testimony and the city's potential liability based upon it.

{¶ 83} A party's belief in its own immunity is not objectively reasonable when the party relies on faulty defenses. *Loder v. Burger* (1996), 113 Ohio App.3d 669, 675, 681 N.E.2d 1357, citing *Woodhams v. Moore* (S.D.Ohio 1994), 840 F.Supp. 517, 520. "A party holding an objectively unreasonable belief in non-liability is not excused from the obligation to enter into settlement negotiations, and cannot insulate himself from liability for prejudgment interest by relying on his own naivete." *Loder*, 113 Ohio App.3d at 675, 681 N.E.2d 1357. Accordingly, the trial court did not abuse its discretion in awarding prejudgment interest.

{¶ 84} The city also argues that even if prejudgment interest is appropriate, the court erred in assessing prejudgment interest from the date the cause of action accrued (June 11, 2002), instead of when the second complaint was filed (June 29, 2005). The city's argument fails, because the jury found the city liable for malicious prosecution, false imprisonment, and intentional infliction of emotional distress.

{¶ 85} Under R.C. 1343.03(C)(1)(b), interest on a judgment "[i]n an action in which the party required to pay the money engaged in the conduct resulting in liability with the deliberate purpose of causing harm to the party to whom the money is to be paid" is to be calculated "from the date the cause of action accrued to the date on which the order, judgment, or decree was rendered."

{¶ 86} The jury found that the city had deliberately attempted to cause harm to Krieger and Oliver. Accordingly, prejudgment interest was properly calculated by the trial court from the date their cause of action accrued.

{¶ 87} Appellant's eighth assignment of error is overruled.

## XII. The Manifest Weight of the Evidence

{¶ 88} In its ninth assignment of error, the city argues that the trial court erred in entering judgment in favor of appellees on the jury's verdict and in failing to grant its motion for a new trial, because the verdict was against the manifest weight of the evidence.

{¶ 89} Civ.R. 59(A)(6) provides that a new trial may be granted when the judgment is not sustained by the weight of the evidence. When considering a Civ.R. 59(A)(6) motion for a new trial, a trial court must weigh the evidence and pass on the credibility of the witnesses. *Edwards v. Haase* (Aug. 1, 2001), 9th Dist. No. 3121–M, 2001 WL 866284. An appellate court reviews the court's decision for an abuse of discretion. *Antal v. Olde Worlde Prods.* (1984), 9 Ohio St.3d 144, 145, 9 OBR 392, 459 N.E.2d 223. Absent some indication that the trial court's exercise of its discretion was unreasonable, arbitrary, or unconscionable, the judgment of the trial court will not be disturbed. *Schlundt v. Wank* (Apr. 17, 1997), Cuyahoga App. No. 70978, 1997 WL 186830

{¶ 90} The reviewing court should be guided by a presumption that the trial court's findings were correct. *Sanders v. Stover,* Cuyahoga App. No. 89241, 2007-Ohio-6202, 2007 WL 4126788, at ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. When a verdict is supported by competent, substantial, and apparently credible evidence, a motion for new trial will be denied. *Schlundt,* supra. Additionally, in reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness. *State v. Jackson* (1993), 86 Ohio App.3d 29, 33, 619 N.E.2d 1135. A trial judge should "abstain from [encroaching upon the jury's fact finding function,] unless it is quite clear that the jury has reached a seriously erroneous result." *Bland v. Graves* (1993), 85 Ohio App.3d 644, 651, 620 N.E.2d 920. Under this standard, the trial court did not err in denying the city's motion for a new trial.

{¶ 91} The city again argues that it cannot be liable, because it is statutorily immune from liability for intentional torts and appellees failed to commence their suit within the applicable statute of limitations. As discussed above, these arguments have no merit.

{¶ 92} With respect to the judgment against the city on appellees' malicious-prosecution claim and false-imprisonment claims, the city argues that appellees failed to rebut the evidence of probable cause flowing from the indictment.

{¶ 93} Probable cause does not depend on whether the claimant was guilty of the crime charged. *Waller v. Foxx* (Oct. 6, 1982), Hamilton App. No. 810568, 1982 WL 4753. Rather, the question is whether the accuser had probable cause to believe that the claimant was guilty. Id. "The person instituting the criminal proceeding is not bound to have evidence sufficient to insure a conviction but is required only to have evidence sufficient to justify an *honest belief* of the guilt of the accused." (Emphasis added.) *DiNucci v. Lis,* Cuyahoga App. No. 88751, 2007-Ohio-4056, 2007 WL 2269740, at ¶ 14.

{¶ 94} "The return of an indictment by the grand jury is evidence of probable cause; when an indictment has been returned by the grand jury, the plaintiff has the burden of producing substantial evidence to establish lack of probable cause. Plaintiff must produce evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular." *Deoma v. Shaker Hts.* (1990), 68 Ohio App.3d 72, 77, 587 N.E.2d 425. (Citations omitted.)

{¶ 95} Appellees produced evidence in this case to demonstrate that the indictment resulted from the perjured testimony of Detective Peachman. Former Cuyahoga County Prosecutor Edward Fitzgerald, the only witness called by the city in this case, testified that in all likelihood, Detective Peachman was the sole witness who presented the case to the grand jury hearing. The city presented no evidence that anyone other than Detective Peachman testified before the grand jury. Prior to that hearing, Detective Peachman had admitted to Krieger, Oliver, their attorneys, and Oliver's father that he knew that Krieger and Oliver had nothing to do with the incident at Jacobs Field. Nevertheless, the grand jury indicted both Krieger and Oliver for felonious assault and aggravated arson. A reasonable inference from the indictment and Detective Peachman's acknowledgement prior to the grand jury proceedings that he knew that Krieger and Oliver had nothing to do with this crime is that Detective Peachman perjured himself at the grand jury hearing to obtain an indictment. In light of this evidence, the trial court did not err in denying the city's motion for a new trial.

{¶ 96} Appellant's ninth assignment of error is overruled.

## XIII. Krieger's Oath

{¶ 97} At the time of trial, Krieger was on active duty in the United States Air Force, stationed in Anchorage, Alaska. Krieger testified at trial by means of a live video feed and was questioned in real time.

{¶ 98} Under Evid.R. 603, "[b]efore testifying, every witness shall be required to declare that [he] will testify truthfully, by oath or affirmation administered in a form calculated to awaken [his] conscience and impress [his] mind with the duty to do so."

{¶ 99} The city objects that no one *in Alaska* administered the oath to Krieger and, therefore, his testimony was unsworn. This argument is without merit. The record reflects that the trial judge administered the oath to Krieger via video feed before he testified.

{¶ 100} Appellant's tenth assignment of error is therefore overruled.

## XIV. Due Process

{¶ 101} Finally, the city argues that the "cumulative effect" of the trial court's errors denied the city due process. Because we found merit to only one of the city's assignments of error, we reject this argument as well. The trial court admittedly erred in awarding attorney fees; that award is vacated. As discussed above, the city's other assignments of error regarding the trial court's judgment are without merit; accordingly, there is no "cumulative error effect" applicable to this case.

{¶ 102} Appellant's eleventh assignment of error is overruled.

Judgment affirmed in part
and vacated in part.

BLACKMON and CELEBREZZE, JJ., concur.