OPINION
{¶ 1} Plaintiffs-appellants, Doug Bergman, et al. ("Plaintiffs"), appeal the decisions of the Butler County Court of Common Pleas which awarded them $88,013.53 in underpaid *Page 2 
wages and $23,211.96 in attorney fees and court costs. We affirm the decisions of the trial court.
 I. Statement of Facts {¶ 2} Monarch Construction, a general contractor, entered into a contract with Miami University ("Miami") to build student housing. Monarch subsequently contracted with Don Salyers Masonry, Inc. ("Salyers") to work on the project which was a public improvement. Because of that status, Monarch and Salyers were required to pay its employees a prevailing wage pursuant to R.C. Chapter 4115. When the Southern Ohio Administrative District Council of BrickLayers and Allied Craftworkers discovered that employees had been underpaid, it filed a complaint pursuant to the statute as an interested party.
 {¶ 3} The Ohio Department of Commerce ("Commerce") investigated the complaint and contacted Salyers multiple times in order to obtain information regarding wages and any fringe benefits paid to the employees. As deadlines came and passed, Salyers failed to provide Commerce with any documentation. In December 2005, Commerce issued an initial determination which ordered Salyers to pay $368,266.34 in back wages and $368,266.34 in penalties. Commerce notified Monarch of the result by sending it a copy of the determination which served as Monarch's first notice of the investigation.
 {¶ 4} Plaintiffs, consisting of the employees who decided not to assign their claim to Commerce for collection, filed suit on February 21, 2006 based on the authority of R.C. 4115.10(A), and seven of those original 36 Plaintiffs are parties to this appeal. Before the trial commenced, Miami was released from the case upon its motion and the court entered a default judgment against Salyers, which is no longer in business.
 {¶ 5} Having received notice for the first time in the form of Commerce's December 2005 determination, Monarch began collecting documentation regarding fringe benefits paid to the employees and supplied the pertinent documentation to Commerce. After receiving *Page 3 
this information for the first time, Commerce agreed to rework its determination and reduced the back pay owed by giving credit for benefits Salyers had paid the employees such as vacation, insurance, disability, and 410K contribution. This new amount was introduced, over objection, at trial and the court adopted the redetermination as it applied to Plaintiffs.
 {¶ 6} At trial, Monarch also introduced evidence that Miami failed to provide timely notice of an increase in the prevailing wage rate so that Miami was responsible for part of the back pay owed. The court agreed, and held that out of the total amount owed to Plaintiffs, Monarch's liability was limited to $88,013.53. The court also denied Plaintiffs' request to penalize Monarch an additional 25 percent of the back wages it owed, as set forth in R.C. 4115.10(A). The court held that the 25 percent penalty is discretionary and based on the circumstances of Monarch never having notice, yet complying as soon as it was served, the penalty was not warranted. The court also refused to award Plaintiffs, on behalf of the director of Commerce, a penalty equal to 75 percent of the back wages owed. The court reasoned that this penalty was also discretionary, as the director very rarely enforced it, and the circumstances of the case did not warrant the penalty.
 {¶ 7} Also within its judgment, the court ordered Monarch to pay court costs and "reasonable attorney fees necessary to collect the amount of judgment." Plaintiffs submitted an application for attorney fees and costs in the amount of $127,853.42 but later corrected that amount to $91,054.42 when Monarch pointed out a $37,170 typographical error included in the original calculation. Monarch countered by asserting that the reasonable fees were, at most, $46,423.92 and that based on the unsuccessful nature of Plaintiffs' case, that amount should be decreased by half. In its decision specific to the fee award, the trial court agreed with Monarch's arguments and limited Plaintiffs' award for attorney fees and court costs to $23,211.96. It is from these two decisions that Plaintiffs now appeal, raising four assignments of error. *Page 4 
 II. R.C. Chapter 4115: Wages and Hours on Public Works {¶ 8} Background information may prove helpful in understanding the complex issues raised in this appeal. Unfortunately, when considering matters under the guise of Ohio's wage law, multiple courts have recognized that the statute is ambiguous and requires a degree of judicial interpretation in order to decide the issues that come before the court for review. See State ex rel. Harris v. Williams (1985),18 Ohio St.3d 198; Rausch v. Farrington Constr, Inc. (1988),51 Ohio App.3d 127; and Harris v. Van Hoose (1990), 49 Ohio St.3d 24.
 {¶ 9} However, the Ohio Supreme Court has provided some guidance in regard to the purpose of the statute and how a court is to construe the more challenging sections. In Harris, the court began its analysis of the wage law statute by stating that "Chapter 4115 provides a comprehensive statutory procedure for effecting compliance with the prevailing wage law through administrative and civil proceedings."18 Ohio St.3d at 200.
 {¶ 10} The court later clarified Ohio legislators' purpose in enacting the wage statute. Harris, 49 Ohio St.3d 24. "The primary purpose of the prevailing wage law is to support the integrity of the collective bargaining process by preventing the undercutting of employee wages in the private sector." Id. at 26, citing State ex rel. Evans v. Moore
(1982), 69 Ohio St.2d 88. In order to fulfill this purpose, the statute requires that contractors or subcontractors pay their employees a state minimum wage as set forth for each trade within a specific geographic location.
 {¶ 11} Should employees not receive wages equal to, or more than, the minimum required by statute, they are directed by R.C. 4115.16 to file a complaint with the director of Commerce. The director then investigates the allegations and issues a determination, sent to both the employees affected and the entity that violated the law. Should the director find that an intentional violation occurred, the violating party is entitled to a hearing. R.C. 4115.13. However, the statute also lays out two instances in which the simple *Page 5 
reimbursement of back wages is sufficient and no further proceedings are necessary; "if any underpayment by a contractor or subcontractor was the result of a misinterpretation of the statute, or an erroneous preparation of the payroll documents." Id. However, the statute does not specifically state the process for unintentional violations, other than those two specific instances set forth above.
 {¶ 12} It is with this challenging ambiguity and limited guidance that we turn to the four issues raised in this appeal. However, we are also mindful of R.C. 1.47 in which the Ohio General Assembly reminds courts that, "in enacting a statute, it is presumed that: (A) Compliance with the constitutions of the state and of the United States is intended; (B) The entire statute is intended to be effective; (C) A just and reasonable result is intended; (D) A result feasible of execution is intended."
 III. Trial Court's Adoption of Commerce's Initial Determination {¶ 13} Assignment of Error No. 1:
 {¶ 14} "THE TRIAL COURT ERRED WHEN IT DISTURBED THE BUREAU'S DECEMBER 2005 DETERMINATION."
 {¶ 15} In their first assignment of error, Plaintiffs argue that the statute of limitations prohibited the court from reviewing Commerce's recalculation, that the court erred by not requiring Monarch to post a bond, and that the court should have deferred to Commerce's initial decision to not credit Monarch with fringe benefit payments because the Ohio Administrative Code is a reasonable regulation. These arguments lack merit.
 {¶ 16} Because the arguments in this assignment call for this court to answer questions of law, the standard of review will be de novo.Ohio Bell Tel. Co. v. Pub. Util. Comm. (1992), 64 Ohio St.3d 145, 147.
 A. Statute of Limitations {¶ 17} First, Plaintiffs claim that the trial court lacked the authority to adopt *Page 6 
Commerce's redetermination because according to R.C. Chapter 2505, the determination became binding once the 30-day window for appeals passed. However, Plaintiffs incorrectly rely on R.C. Chapter 2505 to support their claim that a statute of limitations applied to Commerce's determination. Instead, this case is controlled by R.C. Chapter 4115
which we are reminded by the Ohio Supreme Court, was, despite its ambiguity, intended to be a "comprehensive statutory procedure for effecting compliance with the prevailing wage law through administrative and civil proceedings." Harris, 18 Ohio St.3d at 200. (Emphasis added.)
 {¶ 18} Although the statute is ambiguous regarding the ways in which a party can challenge Commerce's determination if the violation was not specifically found to be intentional, the Harris decision does provide a starting point in the analysis necessary to remove Commerce's determination from the auspices of R.C. Chapter 2505 by first setting out what exactly a determination from Commerce means.
 {¶ 19} In Harris, Howard Electric Co. ("Howard") underpaid several employees and received a determination letter from Commerce which advised the company that an investigation had revealed the violation and that the company had to remit payment within 30 days. The affected employees received letters advising them of the underpayment and stating that according to R.C. Chapter 4115, they had 60 days to initiate suit or Commerce would take whatever action necessary to collect the back wages. Howard filed a notice of appeal from Commerce's determination to the Franklin County Court of Common Pleas, naming as defendants Commerce, its director James W. Harris, and the chief of the prevailing wage department. Director Harris then filed a motion to dismiss, asserting that the determination letter was not a final order subject to appeal. The court denied the director's motion, then became a respondent when the director petitioned the Ohio Supreme Court for a writ of prohibition asking that the common pleas court be stopped before considering the *Page 7 
action. The Ohio Supreme Court granted the writ, stating in the process that determinations pursuant to R.C. Chapter 4115 are not adjudications under R.C. 119.01(D).
 {¶ 20} Instead, the supreme court held that the determination, sent in conjunction with the letters to the affected employees, was notice of the outcome of the investigation and that employees had a right to sue, as well as a means to elicit a settlement of the back wages owed. The court compared the determination letter to right-to-sue letters sent by the Federal Equal Opportunity Commission under the Civil Rights Act which are prepared as mere preparation for further proceedings. "If and when the EEOC or the charging party files suit in the district court, the issue of discrimination will come to life, and the plaintiff will have the opportunity to refute the charges." Harris at 201.
 {¶ 21} For this reason, the court found "that the department's function in this case is an investigatory one, comparable to that of the EEOC, for the reason that the `determination' of the department is notenforceable unless an appropriate court proceeding is filed." Id. at 202. (Emphasis added.) To further cement this holding, the court referenced R.C. 4115.13 which allows Commerce to make adjudication orders only when the director finds that the violation was a result of a misinterpretation or error in payroll preparation. Therefore, the court held "where the department makes a determination after an investigation without a hearing under R.C. 4115.13 that an employer has paid less than the prevailing wage, which determination creates a right to sue under R.C. 4115.10, it is not an adjudication under R.C. 119.01(D) and is thusnot subject to appeal." Id. (Emphasis added.)
 {¶ 22} In the case at bar, the undisputed facts demonstrate that Commerce sent its initial determination to Salyers at the same time they sent the employees their "right-to-sue" letter. In the letter, Commerce explained that it had recently performed an investigation into the wages paid on the Miami University Housing Project and that it "appears from this investigation that you were paid less than required by Ohio's Prevailing Wage Law." The *Page 8 
letter then stated that Salyers had been informed and that any payment it made to Commerce would be forwarded to the employees after processing. The letter also set forth the employees' right to sue under R.C. 4115.10(A), stated that any suit had to have been commenced within 90 days, and that the employees had the right to assign their claim to Commerce who had the right to settle the claim for less than the full amount. The last line of the letter stated, "remember, this letter is not a final adjudication of this issue and does not guarantee back-wages will be collected." It is obvious from the record that the letter referencing the determination was meant to inform the employees of their right to initiate a suit against Salyers or Monarch and that the underlying determination was not a final order which could be appealed.
 {¶ 23} While Plaintiffs admit that the determination was not an adjudication under R.C. 119.01(D), they ask this court to find that Commerce's determination nonetheless falls under R.C. Chapter 2505. However, we cannot.
 {¶ 24} Initially, we note that when the court decided Harris in 1985, it did not apply R.C. Chapter 2505 as an alternate means of allowing the court to hear the appeal of Commerce's determination. The version of R.C. Chapter 2505 in effect when Harris was decided defined an appeal as "all proceedings whereby one court reviews or retries a cause determined by another court, an administrative officer, tribunal, or commission." While the court could have denied the writ based on R.C. Chapter 2505, it did not.
 {¶ 25} Although Plaintiffs point out that R.C. 2505.01 has since been amended to specifically address administrative-related appeals, the statute in its current state still does not permit Commerce's determination to be appealed unless it is a final order.
 {¶ 26} As it currently reads, R.C. 2505.01(A)(1), defines an appeal as "all proceedings in which a court reviews or retries a cause determined by another court, or by an administrative officer, agency, board, department, tribunal, commission, or other *Page 9 
instrumentality." However, R.C. 2505.01(B) goes on to specify that "`administrative-related appeal' means an appeal to a court of thefinal order of an administrative officer, agency, board, department, tribunal, commission, or other instrumentality." (Emphasis added.) The addition of this language to the statute, however, does not turn Commerce's determination into a final order for which R.C. Chapter 2505
applies.
 {¶ 27} R.C. 2505.02 defines what constitutes a final order and lists six categories of actions that may be reviewed, affirmed, modified, or reversed. Essentially, the categories center on a judgment from which a party's rights are affected. As already held by the Ohio Supreme Court, a "`determination' of the department is not enforceable unless an appropriate court proceeding is filed." Harris, at 202. Therefore, Commerce's determination is not a judgment which affects any party's rights. Instead, and only after the trial court rules on the matter, will a judgment occur for which an appeal is appropriate.
 {¶ 28} Plaintiffs correctly assert that R.C. 2505.07 bars an appeal if the would-be appellant brings suit later than 30 days after the decision is rendered. However, the language of the statute again demonstrates that it is inapplicable to the case at bar because the law requires that the entry from the administrative department be a "final order." Here, the statute of limitations is inapplicable because Commerce's determination was not a final order from which either side could appeal. Instead, Plaintiffs were correct in filing a suit in order to determine their rights under R.C. 4115.10(A) and are limited in their appeal to the judgment of the trial court, instead of Commerce's initial determination.
 {¶ 29} We also note that even if R.C. Chapter 2505 had applied, the trial court would have been correct in setting aside Commerce's initial determination, as it would have been a due process violation to hold Monarch to a determination for which it received no notice or a chance to provide fringe benefit documentation. Keeping in mind the fact that the general assembly intends for its statutes to comply with the Federal and Ohio Constitutions, as well *Page 10 
as produce just and reasonable results, it is clear that due process considerations permeate the applicable statutory scheme.
 {¶ 30} According to traditional notions of due process inherent in theFourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution, those whose interests in life, liberty, or property are adversely affected by a government action are entitled to due process. State ex rel. Plain Dealer Publishing Co. v.Floyd, 111 Ohio St.3d 56, 2006-Ohio-4437, ¶ 45. Procedural due process requires the government to give reasonable notice and a meaningful opportunity to be heard on the matter. Atkinson v. Grumman OhioCorp. (1988), 37 Ohio St.3d 80, 85; Crist v. Bd. of Trustees, Battle RunFire Dist. (1996), 115 Ohio App.3d 191, 197.
 {¶ 31} While R.C. 4115.13 guarantees a hearing only when the director finds an intentional violation of the statute, it is clear that every contractor and subcontractor accused of violating the statute is entitled to notice of the investigation and the chance to work with Commerce and the employees to settle the dispute.[1]
 {¶ 32} Here, it is undisputed that Monarch did not receive notice that Commerce was investigating a possible violation of the wage statute or that it had the right to submit fringe benefit documentation to offset back wages owed. The court heard testimony that Monarch was told on multiple occasions by Miami and Salyers that the correct wage was being paid and that they were in full compliance with the statute. Commerce directed all of its correspondence to Salyers and its requests for fringe benefit documentation went unheeded time after time. Not until Commerce sent Monarch a copy of its initial determination did Monarch receive notice of the ongoing investigation and proposed amount of back wages *Page 11 
owed to the employees.
 {¶ 33} Once it received the notice, however, Monarch supplied Commerce the documentation regarding fringe benefits, at which time Commerce credited Monarch for benefits paid to the employees. Requiring Monarch to pay based on a determination for which they had no notice or a chance to respond, would be a due process violation unanticipated by either R.C. Chapters 4115 or 2505. We also note that had the court required Monarch to pay back wages based on the original calculation, without subtracting from that total fringe benefits already paid, the employees would have received a double credit. We are unpersuaded that the legislators intended this result, as it would make implementation of R.C. Chapter 4115 unjust and unreasonable.
 {¶ 34} The trial court, which was charged with determining what amount was owed to Plaintiffs, determined that enforcing the initial determination would have been a violation of Monarch's due process rights. We find no error in this conclusion.
 {¶ 35} Having found that R.C. Chapter 2505 is inapplicable to the case at bar, and that holding Monarch to a determination of which it had no notice or a chance to respond would be a clear due process violation, the trial court properly considered Commerce's recalculation.
 B. Bond {¶ 36} Secondly, Plaintiffs assert that the trial court erred in not requiring Monarch to post a bond before hearing the case. We disagree.
 {¶ 37} Initially, we note that Plaintiffs did not raise this issue in the trial court. Plaintiffs assert that the issue was raised in a summary judgment motion they filed in August 2006. In their motion, Plaintiffs argued that summary judgment was appropriate given the fact that Monarch did not comply with R.C. Chapter 2505 by filing an appeal within 30 days so that as a matter of law, Monarch was required to pay the full amount listed in Commerce's *Page 12 
determination. In the motion's argument section pertinent to the statute of limitations, Plaintiffs stated, "but January 11, 2006 came and passed, and neither a notice of appeal nor a bond was filed by defendants." Plaintiffs went on to reference this statement with a footnote which stated, "Indeed, to date Monarch has posted no bond as required by R.C. 4115.13(E), which provides * * *." However, no other mention was made during the pendency of summary judgment, nor did the court make reference to the bond issue in any subsequent decisions.
 {¶ 38} Plaintiffs' mere mention of the bond requirement, or the fact that Monarch had not posted such a bond, was insufficient to raise the issue for consideration. Instead, in Plaintiffs' conclusion to their motion for summary judgment, they prayed that the court find that they were entitled to back pay, penalties, and court costs/attorney fees. This prayer for relief remained consistent through the pendency of the case, matching Plaintiffs' original complaint which called for reimbursement for back pay, penalties, and court costs/attorney fees.
 {¶ 39} Although not specifically pled, "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Jones v. Alvarez, Butler App. No. CA2006-10-257,2008-Ohio-1994, ¶ 23, citing Civ. R. 15(B). However, the mere mention of the bond issue in one sentence in the motion for summary judgment, as well as the footnote, did not serve to place Monarch on notice that it had to defend against its failure to post a bond.
 {¶ 40} The record also indicates that the court was not made aware that Monarch not paying a bond was at issue during the case. During the two-day bench trial, no mention was made of the bond, and the parties did not make any mention of it in the post-trial briefs which served as closing arguments. The court made no mention of the bond issue in its decision on the amount of back pay owed to Plaintiffs or in the decision granting attorney fees and *Page 13 
court costs.
 {¶ 41} Having determined that the issue was not raised at trial, we are mindful of the well-established rule that appellate courts do not ordinarily consider questions not presented to the court whose judgment it is reviewing. State ex rel. Quarto Mining Co. v. Foreman,79 Ohio St.3d 78, 1997-Ohio-71. "These rules are deeply embedded in a just regard for the fair administration of justice. They are designed to afford the opposing party a meaningful opportunity to respond to issues or errors that may affect or vitiate his or her cause. Thus, they do not permit a party to sit idly by until he or she loses on one ground only to avail himself or herself of another on appeal." Id. at 81.
 {¶ 42} Even so, the statute is clear that a bond is required only in the instances where the violating party brings the suit. R.C. 4115.13(E) states "no appeal to the court from the decision of the director may be had by the contractor or subcontractor unless the contractor or subcontractor files a bond with the court in the amount of the restitution, conditioned upon payment should the decision of the director be upheld." This section directly follows R.C. 4115.13(D) which states that a party who intentionally violates the wage law will be "prohibited from contracting directly or indirectly with any public authority for the construction of a public improvement or from performing any work on the same as provided in section 4115.133." The statute goes on to state that once the director has a hearing on the matter and concludes that the violation was intentional, the contractor or subcontractor has the right to appeal that decision to a trial court. Directly following that language, division (E) states that should such an appeal occur, the subcontractor or contractor will be required to post the bond.
 {¶ 43} In this case, however, Commerce has not found the violation to be intentional. Moreover, Plaintiffs, not Monarch or Salyers, initiated the suit. The language is unambiguous in requiring a bond in the limited instance of an appeal from the decision of the director *Page 14 
brought by the contractor or subcontractor.
 {¶ 44} R.C. Chapter 4115 does not require the contractor or subcontractor to post a bond when they are named as defendants in the suit, so that Monarch would not have been required to post one.
 C. Deference to Re-Determination {¶ 45} Finally, Plaintiffs argue that the trial court erred in not deferring to Commerce's reasonable interpretation of the statute it is charged with implementing. We disagree.
 {¶ 46} Plaintiffs begin by citing Chevron, U.S.A., Inc. v. NaturalRes. Def. Council (1984), 467 U.S. 837, 104 S.Ct. 2778, and its progeny for the proposition that where a statute is silent on an issue, the court reviewing the decision of the administration charged with implementing the statute should defer to the administration's interpretation so long as it is reasonable. Essentially, the holding inChevron affects this appeal because of the ambiguity in R.C. Chapter 4115 and the amount of deference the court should have accorded Commerce and its decision to recalculate its original determination.
 {¶ 47} In Chevron, the Supreme Court stated, "`the power of an administrative agency to administer a congressionally created * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." 467 U.S. 843-844, citing Morton v.Ruiz (1974), 415 U.S. 199, 231, 94 S.Ct. 1055. The Ohio Supreme Court adopted this Chevron standard when it *Page 15 
decided N. W. Ohio Bldg. Const. Trades Council v. Conrad,92 Ohio St.3d 282, 2001-Ohio-190.
 {¶ 48} Plaintiffs ask this court to find that the trial court erred by not granting deference to Commerce's original determination which did not consider the fringe benefits paid to the employees. While we agree with Plaintiffs that the court should have shown deference to Commerce's interpretation of its rights and duties under R.C. Chapter 4115, we come to a different conclusion then they do.
 {¶ 49} Again, Plaintiffs begin this argument by stating that the court should have considered only the original determination in which the fringe benefits were not accounted. Plaintiffs then apply theChevron standard to support their assertion that the court erred by considering the fringe benefit set-off in Commerce's recalculation. Specifically, Plaintiffs argue that Commerce reasonably interpreted R.C. Chapter 4115 to permit the investigator to not consider the fringe benefit information which Salyers failed to provide, and that the court should have given deference to that calculation. However, if the court had not given deference to Commerce's recalculation, it would have ignored the principles set forth in Chevron.
 {¶ 50} The court heard testimony regarding the way Commerce views its implementation authority under R.C. Chapter 4115 from Robert Kennedy, Chief of the Bureau of Wage and Hour, a division of Labor and Work Safety under Ohio's Department of Commerce. During his testimony, both parties asked Kennedy specific questions hoping to clear up ambiguities in the statute. Pertinent to this appeal, Kennedy explained the process by which an employee makes a complaint, how Commerce investigates that complaint, and then makes an initial determination as to the whether the violation occurred and what backpay the violating party may owe. Kennedy called this initial step a "predetermination" in which Commerce lets the contractor know that the investigation has revealed a violation and *Page 16 
allows the party to supplement the record so that Commerce could have "the audits as accurate as possible before [it] actually issue[s] a determination." This initial step then becomes an official determination when Robert Kennedy signs it and sends notice to the interested parties.
 {¶ 51} During his testimony, Kennedy also explained that Commerce will discount the amount of back wages owed by giving the contractor or subcontractor credit for any fringe benefits they have paid. However, if the violating party does not supply the requested documentation, Commerce will not discount the difference between the statutory minimum wage and that actually paid by the violating party.
 {¶ 52} During the second day of the bench trial, the court heard testimony from Shari Hettesheimer, an investigator for Commerce, who investigated the employees' claim against Monarch and Salyers. During her testimony, Hettesheimer explained that after Monarch received her original determination that it owed $368,266.34 in back wages and $368,266.34 in penalties, representatives from Monarch called and stated that they had not known about the violations and wished to provide fringe benefit documentation. Hettesheimer testified that she told Monarch if it provided the necessary documentation, she would perform a recalculation, and that "we do that all the time." She also testified that as information comes into her office, she often performs recalculations multiple times on the way to a settlement of the claim. When Plaintiffs' counsel asked Hettesheimer what her duties were, she responded, "I do the audit. When I get the information, I do the audit. Sometimes I have to do redeterminations three or four times, depending on the information that I get and when I get it." She concluded her testimony by explaining that she would continue to recalculate a determination until her superiors told her that any further recalculation was unwarranted.
 {¶ 53} Specifically, R.C. Chapter 4115 does not speak to whether Commerce has the authority to recalculate an initial determination and no court has interpreted the statute to *Page 17 
hold that it does not. Because of this gap or silence in the statute, the court was obligated to defer to the implementing agency's interpretation of the statute.
 {¶ 54} After hearing the testimony, the court concluded that Commerce's policy was to consider additional documentation and to adapt its initial determination based on any new information received. The court properly granted deference to Commerce and its decision to construe its duties and rights to include recalculation of an initial determination. Based on a reading of R.C. Chapter 4115, it is neither arbitrary nor capricious for Commerce to have the authority to recalculate the wages once an initial determination is made. The purpose of the statute is to protect workers' rights and to make sure that they are paid according to prevailing wage statutes, as well as any collective bargaining agreement. The General Assembly specifically stated that fringe benefits should be taken into consideration when calculating whether a contractor or subcontractor complied with the wage requirements. R.C. 4115.03(E)(3)(a)-(j). Commerce, if it did not have the authority to recalculate a determination based on fringe benefit information, would not be able to implement its duties under the statute.
 {¶ 55} To not allow Commerce to take into consideration documentation of these fringe benefits would produce an unreasonable result in that the violating party would not receive any credit for benefits they have already paid the employees, while the employees would receive much more than they contracted for or is required by the statute. It is also unreasonable to expect Commerce to speculate at what credit should be given to the contractors and subcontractors in the absence of proper documentation. Instead, Commerce has reasonably interpreted R.C. Chapter 4115 to allow it to take into consideration fringe benefits and to adjust its determination of back wages owed as proper documentation of fringe benefits paid is made available to it for consideration.
 {¶ 56} We agree with Plaintiffs that the court should have deferred to Commerce's *Page 18 
interpretation of R.C. Chapter 4115. While Plaintiffs would rather see the court defer to the original determination, Commerce itself reasonably interpreted its duties to include recalculating the determination after Monarch supplied the fringe benefit documentation. After giving due deference to Commerce, the trial court adopted its recalculation and did not err in doing so.
 {¶ 57} Having found that R.C. Chapter 2505 is inapplicable, that Monarch was not required to post a bond, and that the trial court gave Commerce its due deference in adopting the recalculation, Plaintiffs' first assignment of error is overruled.
 IV. Miami's Liability {¶ 58} Assignment of Error No. 2:
 {¶ 59} "THE TRIAL COURT ERRED WHEN IT PERMITTED DEFENDANT A DISCOUNT."
 {¶ 60} In Plaintiffs' second assignment of error, they argue that the trial court erred by discounting the amount Monarch owed in back wages by the amount for which Miami was responsible. We disagree.
 {¶ 61} According to R.C. 4115.05, "Upon receipt from the director of commerce of a notice of a change in prevailing wage rates, a public authority shall, within seven working days after receipt thereof, notify all affected contractors and subcontractors with whom the public authority has contracts * * *. If the director determines that a contractor or subcontractor has violated sections 4115.03 to 4115.16 of the Revised Code because the public authority has not notified the contractors or subcontractor as required by this section, the publicauthority is liable for any back wages, fines, damages, court costs, andattorney's fees associated with the enforcement of said sections by the director for the period of time running until the public authority gives the required notice to the contractor or subcontractor." (Emphasis added.) *Page 19 
 {¶ 62} Here, Miami failed to provide the correct information so that Monarch's liability was limited by Miami's liability for its error, or the difference in wages paid and what should have been paid for the amount of time Miami failed to provide Salyers and Monarch with the correct prevailing wage information.
 {¶ 63} Plaintiffs now assert that the trial court's decision to discount damages by Miami's liability was in error because according to R.C. Chapter 4115 and pertinent case law, the violating contractor is 100 percent responsible for all back wages and penalties owed. Plaintiffs argue that instead of discounting the amount owed to them, the correct cause of action would be a contribution claim filed by Monarch against Miami.
 {¶ 64} To support this assertion, Plaintiffs cite Ohio Asphalt Paving,Inc. v. Ohio Dept. of Indus. Relations et al. (1992), 63 Ohio St.3d 512. In Ohio Asphalt, the court reversed the decision of the appellate court which held that a contractor is not liable for failing to pay prevailing wages when the public authority with which it contracted did not include a provision for prevailing wages in the contract. Instead, the Ohio Supreme Court held that a contactor must pay prevailing wages even if the contract does not contain any such specification.
 {¶ 65} While the decision places a duty on contractors to comply with R.C. Chapter 4115 even in the absence of a contractual clause indicating that such compliance is necessary, the court also predicated that holding by stating that it was subject to the public authority not providing the contractor with a change in the prevailing wage rate. "Except as provided in R.C. 4115.05, a contractor will be held liable for the underpayment of prevailing wages with respect to a public improvement contract, even where the public authority fails to include prevailing wage specifications in that contract." Id. at paragraph one of the syllabus. In the analysis of that holding, the court placed a footnote by its citation to R.C. 4115.05 which stated "R.C. 4115.05
places liability upon the public authority whenever it fails to notify the contractor of any changes in the prevailing rate of wages during the life of the contract." *Page 20 
Id. at fn. 2.
 {¶ 66} While Plaintiffs contend that Ohio Asphalt stands for the proposition that a contractor is always fully liable for its duty to pay the prevailing wage and the proper remedy is to seek contribution from the public authority, they ignore the court's specific mention of R.C. 4115.05 in which legislators intended the public authority to be liable for its failure to notify the contractor of a change in the prevailing wage rate.
 {¶ 67} As referenced at the bench trial, Commerce was negotiating the amount that Monarch would pay those employees that chose to assign their rights to Commerce in lieu of participating in the suit against Monarch. Kennedy testified that Commerce was in the process of negotiating with Miami the amount it was responsible for paying the employees due to the liability imposed by R.C. 4115.05 for failing to provide Salyers or Monarch with the change in the prevailing wage rate.
 {¶ 68} Having found that R.C. 4115.05 placed liability on Miami for not providing the change in prevailing wage rates, the trial court did not err in discounting the amount Monarch owed Plaintiffs. The second assignment of error is overruled.
 V. Statutory Penalties {¶ 69} Assignment of Error No. 3:
 {¶ 70} "THE TRIAL COURT ERRED WHEN IT REFUSED TO ORDER PENALTIES."
 {¶ 71} In their third assignment of error, Plaintiffs argue that the trial court erred by not ordering Monarch to pay penalties according to R.C. 4115.10(A) because Plaintiffs were entitled to receive them. This argument lacks merit.
 A. 25 Percent Penalty Paid to Employees {¶ 72} Plaintiffs claim that the trial court erred by not awarding them an additional 25 percent of back wages because the penalty is required by R.C. 4115.10(A). We disagree.
 {¶ 73} R.C. 4115.10(A) states: "No person, firm, corporation, or public authority that *Page 21 
constructs a public improvement * * * shall violate the wage provisions of sections 4115.03 to 4115.16 of the Revised Code. * * * Any employee upon any public improvement, except an employee to whom or on behalf of whom restitution is made pursuant to division (C) of section 4115.13 of the Revised Code, who is paid less than the fixed rate of wages applicable thereto may recover from such person, firm, corporation, or public authority * * * the difference between the fixed rate of wages and the amount paid to the employee and in addition thereto a sum equal to twenty-five per cent of that difference. The person, firm, corporation, or public authority who fails to pay the rate of wages so fixed also shall pay a penalty to the director of seventy-five per cent of the difference between the fixed rate of wages and the amount paid to the employees on the public improvement." (Emphasis added.)
 {¶ 74} We note initially that the Ohio Supreme Court has found that this section is penal in nature and "it must therefore be strictly construed." Dean v. Seco Elec. Co. (1988), 35 Ohio St.3d 203, 205-206. The central difference between the two penalties is the language, in that the statute states that the employees "may recover" a penalty equal to 25 percent of wages owed them while later requiring the 75 percent penalty paid to Commerce. "In statutory construction, the word `may' shall be construed as permissive and the word `shall' shall be construed as mandatory unless there appears a clear and unequivocal legislative intent that they receive a construction other than their ordinary usage." Dorrian v. Scioto Conservancy Dist. (1971), 27 Ohio St.2d 102, paragraph one of the syllabus.
 {¶ 75} The court in Dorrian went on to explain, "the statutory use of the word `may' is generally construed to make the provision in which it is contained optional, permissive, or discretionary at least where there is nothing in the language or in the sense or policy of the provision to require an unusual interpretation. The word `shall' is usually interpreted to make the provision in which it is contained mandatory especially if frequently repeated. Ordinarily, *Page 22 
the words `shall' and `may,' when used in statutes, are not used interchangeably or synonymously. * * * However, in order to serve the basic aim of construction of a statute-to arrive at and give effect of the intent of the General Assembly-it is sometimes necessary to give to the words `may' and `shall' as used in a statute, meanings different from those given them in ordinary usage and one may be construed to have the meaning of the other. But when this construction is necessary, the intention of the General Assembly that they shall be so construed must clearly appear from a general view of the statute under consideration as where the manifest sense and intent of the statute require the one to be substituted for the other." Id. at 107-108 (internal citations omitted).
 {¶ 76} Here, there does not seem to be any clear intent from the legislators that they intended their choice of the word "may" to actually mean "shall" or that the 25 percent penalty is anything but discretionary. In practice, Commerce views the 25 percent penalty as a bargaining tool, instead of a mandatory penalty it must enforce. When specifically asked if Commerce viewed the penalty as mandatory, Chief Robert Kennedy replied by referencing the fact that "the statute says `shall' on the 75 percent," but did not state that Commerce views the 25 percent penalty having the same mandatory nature. As discussed in Kennedy's testimony, Commerce negotiates with the violating party in order to settle the dispute before it reaches trial and takes into consideration any penalties that may be assessed, the reason a penalty will be assessed, and what amount will be required of the violating party.
 {¶ 77} In settling the claims with the employees who did not choose to bring a suit, Commerce and Monarch agreed to a settlement that took into consideration any penalties that could have been assessed and those claims are now settled. The fact that Commerce has the power to negotiate with violating parties the amount of penalty that will be assessed, if any, demonstrates that the penalty is discretionary in nature.
 {¶ 78} Additionally, the statute's language, and the way that the drafters worded the *Page 23 
various sections, demonstrates that the collection of the penalty is intended to be discretionary. Throughout R.C. Chapter 4115, instead of always using "may", the drafters specifically use "shall" when they are explaining under what circumstances the violating party must be responsible for penalties. For example, in addition to the 75 percent penalty due the director, the drafters also stated that should employees prevail on a claim, the "employer shall pay the costs and reasonable attorney's fees allowed by the court." R.C. 4115.10(A). The penalty section of the statute also states "whoever violates section 4115.08 or4115.09 of the Revised Code shall be fined not less than twenty-five nor more than five hundred dollars." R.C. 4115.99.
 {¶ 79} While the legislators used "shall" on various occasions, they also used "may" to inform the employees, employers, or any enforcing agency that they have a choice of what actions to take. For example, R.C. 4115.10(B) states that "any employee upon any public improvement who is paid less than the prevailing rate of wages applicable thereto may file a complaint in writing with the director * * * The complaint shall include documented evidence to demonstrate that the employee was paid less than the prevailing wage in violation of this chapter." This language sets forth a choice the employees have to pursue a claim. However, their discretion regarding the process vanishes should the employees decide to file a complaint with the director because they are then required to include specific information in their complaint.
 {¶ 80} The difference between "may" and "shall" is also demonstrated in R.C. 4115.16(D) which directs when a court must award attorney fees and when that choice is discretionary. "Where, pursuant to this section, a court finds a violation of sections 4115.03 to 4115.16 of the Revised Code, the court shall award attorney fees and court costs to the prevailing party. In the event the court finds that no violation has occurred, the court may award court costs to the prevailing party, other than to the director or the pubic authority, *Page 24 
where the court finds the action brought was unreasonable or without foundation, even though not brought in subjective bad faith." This language demonstrates the difference between the legislators' use of "shall" and "may." When using "shall," the drafters specifically reinforce the idea that prevailing employees will be awarded attorney fees. However, by using "may," the legislators vest discretion in the court so that before it can award fees to a prevailing employer, it must first use its discretion to find that the employee's claim was unreasonable or brought without foundation.
 {¶ 81} Therefore, this vacillation between "shall" and "may" throughout R.C. Chapter 4115 demonstrates that there were certain circumstances where the General Assembly intended the parties to have options or different results available, versus when they wanted strict compliance with the statute.
 {¶ 82} To support their claim that the penalty is mandatory, Plaintiffs rely on Internatl. Bhd. of Electrical Workers, Local UnionNo. 8 v. Stollsteimer Elec., Inc., 168 Ohio App.3d 238, 2006-Ohio-3865, in which the Sixth District Court of Appeals found that the penalty was mandatory. In Stollsteimer, the court was charged with reviewing appellants' claims that the trial court erred in not granting attorney fees and by not ordering penalties pursuant to R.C. 4115.10(A). After the parties stipulated that the violations were unintentional, the parties filed motions for summary judgment regarding Stollsteimer's obligation to pay attorney fees and penalties.
 {¶ 83} The lower court found in favor of Stollsteimer, citing the "safe harbor" provision of R.C. 4115.13(C) which excuses a violating party from further proceedings should their violation be a result of statutory misinterpretation or payroll errors. However, the appellate court reversed and remanded the cause because it found that the statute only listed two instances where a violating party would be excused and Stollsteimer's violation, while unintentional, did not fall in either of those two instances. Instead, the court found that *Page 25 
Stollsteimer should have been ordered to pay attorney fees according to R.C. 4115.10(A).
 {¶ 84} The court then went on to conclude, "R.C. 4115.10(A) clearly enumerates penalties to be assessed against entities who have violated the prevailing-wage law. The only exception to this rule is that when the director of commerce makes a finding that the underpayment of wages was the result of misinterpretation of the prevailing-wage law or an erroneous preparation of payroll documents and the entity who made the mistake had made restitution, the entity is exempt from the penalty provision requiring it to pay to the employee 25 percent of the difference between the fixed rate of wages and the amount paid to the employee. R.C. 4115.10(A) does not exempt the offending entity from the penalty it is required to pay the director. Accordingly, we must conclude that the trial court erred in failing to assess statutory penalties on Stollsteimer upon its finding that Stollsteimer violated the prevailing-wage law * * *." Id. at ¶ 22-23.
 {¶ 85} Although the court in Stollsteimer applied various methods of statutory interpretation in order to determine that any violating party, save the two exceptions in R.C. 4115.13(C), is subject to further proceedings, it did not complete an analysis as to whether the penalties themselves were mandatory or discretionary.
 {¶ 86} While this court agrees that R.C. 4115.13(C) excuses only two specific unintentional violations from being subject to further proceedings, we decline to follow the Sixth District Court of Appeals' finding that the 25 percent penalty is mandatory. Instead, we rely on the analysis we have provided above as well as a brief examination of how other courts have dealt with similar issues.
 {¶ 87} A review of federal law and other states with similar prevailing wage statutes reveals that other courts look to the language of the statute and differentiate between penalties that "shall" and "may" be assessed. See Taylor v. Commtec/Pomeroy Computer Resources,Inc. (S.D.W.Va. 2006) 2006 WL 362463, *2 (noting that "not only can workers *Page 26 
recover the difference between the rate the worker is paid and the posted prevailing wage, but also a statutory penalty equal to the difference, and reasonable attorneys' fees" because West Virginia's prevailing wage statute states that any underpaid employee "may recover" the penalty); Amaral v. Cintas Corp. No. 2 (2008),163Cal.App.4th 1157 (finding penalties in California's labor laws are mandatory because the code states that violators "shall be subject to a civil penalty"); N. Marion Sch. Dist. 15 v. Acstar Ins. Co. (2007), 343 Or. 305, 313 (finding that the commissioner "can assess a civil penalty" where Oregon's statute stated "In addition to any other penalty provided by law, the Commissioner of the Bureau of Labor and Industries may assess a civil penalty * * *"); and Beverly Enters. Inc. v. Herman
(D.D.C. 1999), 50 F. Supp.2d 7, fn. 2 (noting that the administrator had the discretion to assess a penalty for violation of the Federal labor statute because Section 655.410, Title 20, C. F.R. states that "the Administrator may assess a civil money penalty not to exceed $1,000 for each affected person with respect to whom there has been a violation * * *).
 {¶ 88} Similar to these other examples of labor laws requiring prevailing wage rates, Ohio's legislators specifically chose to differentiate between the 25 percent penalty paid to the employees and the 75 percent penalty paid to Commerce. Mindful that strict construction is necessary given the penal nature of R.C. 4115.10(A), we conclude that because the legislators used the word "may," Ohio's 25 percent penalty is not mandatory and should be imposed at the discretion of the enforcing entity. Therefore, we turn now to the court's decision that the penalty was not warranted in this case.
 {¶ 89} Based on a reading of the statute, the drafters had an obvious intent to punish intentional violations to a greater extent than they did unintentional violations. This is evidenced by R.C. 4115.13(C) which provides that a violating party who has misinterpreted the statute or made a payroll error has the opportunity to reimburse employees and is not held "subject to any further proceedings pursuant to sections 4115.03 to 4115.16 of the *Page 27 
Revised Code." Additionally, R.C. 4115.10(A) also specifically excludes contractors or subcontractors whose violation occurred as a result of misinterpretation of the statue or a payroll error from being subject to the 25 percent penalty at all. While the legislators drafted the law to show more lenience to those whose violations were unintentional, those found to have intentionally violated the statute are open to prohibition from further public projects, [2] criminal prosecution, [3] and having their name appear on a list of companies who have not complied with the wage statue as published by the director of Commerce.[4]
 {¶ 90} The drafters define "intentional violation" as "a willful, knowing, or deliberate failure to comply with any provision of sections 4115.03 to 4115.16 of the Revised Code," and then list several instances where a violation is to be found intentional. R.C. 4115.13(H). Based on this definition, Monarch did not intentionally violate the prevailing wage statute. Instead, it asked both Miami and Salyers if it was abiding by the applicable wage rate. Monarch was assured that it was and nothing on the record contests this fact. Additionally, once Commerce sent Monarch a copy of its initial determination, Monarch did everything it could to comply with Commerce's request for fringe benefit information and later settled all claims other than those pursued by Plaintiffs in this appeal.
 {¶ 91} Based on a review of the record, we cannot say that requiring Monarch to pay a 25 percent penalty, for a violation of which they were unaware, was warranted. Neither the director of Commerce nor the trial court found Monarch's violation to be intentional, and there is nothing in the record to indicate that it was. Therefore, the trial court did not err by ordering that Monarch not be required to pay Plaintiffs a 25 percent penalty in addition to the back wages they were owed. *Page 28 
 B. 75 Percent Penalty to Commerce {¶ 92} Plaintiffs also contend that the trial court erred in not ordering Monarch to pay a 75 percent penalty to Commerce for its violation of the prevailing wage statute. While we reach the same conclusion as the trial court, we do so for different reasons.
 {¶ 93} As cited above, R.C. 4115.10(A) states that a violating party "shall pay a penalty to the director of seventy-five per cent of the difference between the fixed rate of wages and the amount paid to the employees on the public improvement." The statute then instructs the director to deposit the money into a fund to help Commerce enforce the prevailing wage statute.
 {¶ 94} There is no need to address the trial court's decision to not impose the penalty on Monarch if Plaintiffs lacked standing to bring the claim on behalf of Commerce. Whether a party has standing to pursue a cause is a matter of law so that our standard of review is de novo.McFall v. Watson, Vinton App. No. 08CA666, 2008-Ohio-5204. Therefore, without deference to the trial court, we must determine whether Plaintiffs are the proper party to seek enforcement of the statutory penalty.
 {¶ 95} "It is well established that before an Ohio court can consider the merits of a legal claim, the person seeking relief must establish standing to sue." State ex rel. Ohio Academy of Trial Lawyers v.Sheward, 86 Ohio St.3d 451,1999-Ohio-123, 469. The Ohio Supreme Court has defined standing as "a party's right to make a legal claim or seek judicial enforcement of a duty or right." Ohio Pyro, Inc. v. OhioDept. of Commerce, 115 Ohio St.3d 375, 2007-Ohio-5024, ¶ 27, citing Black's Law Dictionary (8th Ed. 2004) 1442. If a party to a suit is not the real party in interest, that party lacks standing to pursue the cause. Krieger v. Cleveland Indians Baseball Co., 176 Ohio App.3d 410,2008-Ohio-2183. A true party in interest is able to demonstrate an injury in fact, "which requires a showing that the party has suffered or will suffer a specific injury." Camp St. Mary's Assn. of W. OhioConference of the *Page 29 United Methodist Church, Inc. v. Otterbein Homes, 176 Ohio App.3d 54,2008-Ohio-1490, ¶ 13.
 {¶ 96} Specific to asserting the rights of third parties, a litigant must generally pursue its own claims, and lacks standing to assert the rights of another. City of N. Canton v. City of Canton,114 Ohio St.3d 253, 2007-Ohio-4005. However, an exception does exist when "a claimant (i) suffers its own injury in fact; (ii) possesses a sufficiently `close' relationship with the person who possesses the right; and (iii) shows some `hindrance' that stands in the way of the claimant seeking relief." Id. at ¶ 14, quoting Kowalski v. Tesmer (2004), 543 U.S. 125,129-130, 125 S.Ct. 564.
 {¶ 97} When considering the three-step test set forth in NorthCanton, even if we conceded the first two prongs, there is nothing in the record which indicates that Commerce was hindered from seeking relief on its own behalf.
 {¶ 98} As previously referenced, the court heard testimony from Commerce that in its own view, the 75 percent penalty is mandatory but that it is primarily used as a bargaining tool to entice violating parties to settle claims without going to trial. When asked if the penalty is discretionary or mandatory, Kennedy stated "the statute says `shall' on the 75 percent. So, — but I can't think of one we actually have a case on here. We actually negotiate those prior to going to trial. So, we've only had one go to trial since I've been here."
 {¶ 99} This testimony demonstrates that Commerce views its right to receive the statutory penalty as a tool with which it can seek enforcement of the prevailing wage statute. However, should Commerce decide to pursue its right to receive the penalty, it has sought imposition of the penalty on its own behalf. Nothing on the record indicates that Commerce was unable to pursue its own claim for the 75 percent penalty against Monarch or needed to rely on Plaintiffs to assert its rights in anyway. Further, Commerce could have initiated its own claim against Monarch for enforcement of the penalty, but instead chose to settle the *Page 30 
claims made by non-Plaintiff employees without going to trial.
 {¶ 100} Commerce[5] will have the right to pursue its claim to the 75 percent penalty for Monarch's underpayment to the seven Plaintiffs that did not assign their rights to Commerce, and instead remain in this appeal. It is otherwise improper for this court to consider Plaintiffs' claim that the trial court erred in not ordering Monarch to pay the penalty.
 {¶ 101} Although Plaintiffs properly brought suit to move the court to award the 25 percent penalty on their own behalf, they do not have standing to challenge the decision to not award the 75 percent penalty to Commerce.
 {¶ 102} Having found that the court did not err by not ordering Monarch to pay the 25 percent penalty and that Plaintiffs lack standing to pursue a claim that rightfully belongs to Commerce, Plaintiffs' third assignment of error is overruled.
 VI. Attorney Fees {¶ 103} Assignment of Error No. 4:
 {¶ 104} "THE TRIAL COURT ERRED WHEN IT REFUSED TO AWARD ATTORNEY FEES CONSISTENT WITH BITTNER."
 {¶ 105} In their fourth assignment of error, Plaintiffs argue that the trial court erred in not ordering Monarch to pay Plaintiffs' attorney fees and court costs in their entirety. We disagree.
 {¶ 106} According to R.C. 4115.10(A), "where the employee prevails in a suit, the employer shall pay the costs and reasonable attorney's fees allowed by the court." The Ohio Supreme Court set out a two-step process by which an appellate court is to review a trial *Page 31 
court's fee award in Bittner v. Tri-County Toyota, Inc. (1991),58 Ohio St.3d 143.
 {¶ 107} First, the court is to establish what has commonly been referred to as a lodestar. The lodestar is determined by taking the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. at 145. Though the said calculation would result in a tangible figure, the "calculation provides an objectivebasis on which to make an initial estimate of the value of the lawyer's services." Id. (Emphasis added.) During this initial calculation, the court should exclude any hours which were unreasonably expended from inclusion in the lodestar. Gibney v. Toldeo Bd. Of Educ. (1991),73 Ohio App.3d 99. "Unreasonably expended hours are generally categorized as those which are excessive in relationship to the work done, are duplicative or redundant, or are simply unnecessary." Id. at 108.
 {¶ 108} Second, the court should then consider factors set forth in DR 2-106(B)[6] which include: "the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent. All factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation." Bittner at 145-146.
 {¶ 109} The court also discussed the proper standard of review an appellate court should apply when reviewing the trial court's decision regarding attorney fees. Although *Page 32 
Plaintiffs assert that the review should be de novo because the case required the trial court to interpret the prevailing wage statute, [7]Bittner is clear that an abuse of discretion standard is appropriate.
 {¶ 110} "It is well settled that where a court is empowered to award attorney fees by statute, the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere. The trial judge who participated not only in the trial but also in many of the preliminary proceedings leading up to the trial had an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court." Id.
 {¶ 111} Plaintiffs submitted their application for attorney fees, complete with a breakdown of every unit of time expended on the case, as well as a computation based on the hourly rate of who performed each task. In total, Plaintiffs requested $91,054.42 for approximately 497 hours of work during the pendency of the case.
 {¶ 112} After being served with the application for fees, Monarch made several arguments to the trial court and the court agreed with each of Monarch's assertions. First, the court referenced Bittner and recognized that it needed to perform the two-step determination of reasonable fees. In calculating the lodestar, the court took the Plaintiffs' suggested lodestar and subtracted the unreasonable fees charged for endeavors that were unnecessary or meritless to begin with. See State ex rel. OhioPatrolmen's Benevolent Assn. *Page 33 v. Mentor, 89 Ohio St.3d 440, 448, 2000-Ohio-214 (holding that appellants were "not entitled to attorney fees concerning those claims that were meritless").
 {¶ 113} These charges related to unsuccessful motions for a restraining order, two motions for summary judgment, a motion to strike Monarch's trial exhibits, a motion for prejudgment interest, as well as an opposition to Miami's motion to be dismissed from the case. The court also subtracted fees Plaintiffs' counsel charged for litigating claims against defendants other than Monarch, [8] as well as hours billed for travel time. The court then subtracted hours billed for preparing witnesses who never appeared at the hearing and for preparation for closing arguments that were never given at the hearing.[9] The court also noted that many hours were billed for trial attendance of attorneys who did not present arguments or otherwise participate in the trial. The other unreasonable hours subtracted from the lodestar included travel time to serve subpoenas for witnesses that did not even testify. While the court deemed these fees unnecessary and did not include them in the lodestar, it kept the reasonable fees in place for the work necessary to collect the amount of judgment as was ordered in the court's original decision.
 {¶ 114} After all applicable subtractions, the court determined that the lodestar was $46,423.92. The second step of the Bittner process called for the court to analyze the factors set forth in DR 2-106(B). In addition to the factors set forth above, the court in Bittner spoke specifically to the "results obtained factor" by calling it an "important factor" and stating, "the results-obtained factor encompasses the degree of success enjoyed by the prevailing party."58 Ohio St.3d at 145.
 {¶ 115} Here the Plaintiffs waged a very unsuccessful litigation given that no facts were *Page 34 
ever in dispute. At every phase of the suit, Plaintiffs were denied each motion they made and lost every contested issue at trial. Moreover, the amount finally awarded was the same amount Monarch agreed to pay before the trial began, and those employees who did not take part in the suit were paid through Commerce. Based on the lack of success, the court, in its discretion, ordered a 50 percent decrease in the lodestar so that Monarch, who had been forced to expend its own legal fees to defend itself against all of Plaintiffs' meritless actions, was ordered to pay $23,211.96 in attorney fees. See Wall v. Pizza Outlet, L.P., Stark App. No. 2002CA00400, 2003-Ohio-3369 (finding no abuse of discretion where trial court subtracted fees from proposed lodestar then further cut $19,420.50 lodestar to $8,938 based on DR 2-106(B) factors).
 {¶ 116} While Plaintiffs argue that the trial court's decision essentially cut the fees twice for the same reason, the record indicates that the court followed the process set forth in Bittner. In its judgment entry awarding Plaintiffs back pay and attorney fees, the court stated that Plaintiffs were entitled to "reasonable attorney feesnecessary to collect the amount of judgment." (Emphasis added.) This first step of Bittner is objective and the trial court, by removing the fees specific to the meritless filings; including multiple motions for summary judgment, injunctive relief, and prejudgment interest, arrived at a lodestar comprised only of reasonable hours. The second step allows a court to consider various factors to further cut a lodestar comprised of reasonable hours. Here, the court considered the fact that Plaintiffs were awarded the same amount that Monarch agreed to pay before the trial began, and that employees who had not pursued litigation had long since been paid. Additionally, there were no issues of fact presented at trial. The overall success factor mentioned by the court would encompass these considerations, not just the hours expended on unsuccessful motions.
 {¶ 117} We also note that case law requires the trial court to specifically delineate the reasons for deviating from the lodestar.Estate Planning Legal Services, P.C. v. Cox, Warren *Page 35 
App. Nos. CA2006-11-140, CA2006-12-141, 2008-Ohio-2258. Most reviewing courts do not find an abuse of discretion where the trial court specifically lists its reason for deviating from the lodestar and then lists the DR 2-106 factors and analyzes them. See Wall, 2003-Ohio-3369 (affirming reduction in lodestar where court gave detailed explanation for doing so).
 {¶ 118} While the trial court in this case laid out Monarch's arguments in sufficient detail, it simply stated "this Court agrees with Monarch's arguments" and then granted Plaintiffs' motion for fees in the amount of $23,211.96. While a remand to clarify the reasons for figuring the lodestar and later reduction of the lodestar based on DR 2-106 would have been warranted and helpful to this review, Plaintiffs failed to argue this point on appeal.
 {¶ 119} Having found that the trial court did not abuse its discretion in awarding Plaintiffs' reasonable attorney fees and court costs pursuant to R.C. 4115.10(A), Plaintiffs' fourth assignment of error is overruled.
 {¶ 120} Judgment affirmed.
BRESSLER and POWELL, JJ., concur.
[1] The existence of mandatory hearings for intentional violations, but none for unintentional violations, further substantiates our reasoning that Commerce's determinations regarding unintentional violations, other than the two specific instances listed, are not final orders given that a statute which patently denies a party the chance to be heard before rendering a judgment which adversely affects one's property interest would be in direct dereliction of the due process requirements in both the Federal and Ohio Constitutions.
[2] R.C. 4115.133(B).
[3] R.C. 4115.99(B).
[4] R.C. 4115.133(A).
[5] In State ex rel. Natl. Electrical Contractors Association, OhioConference v. Ohio Bureau of Emp. Services, 83 Ohio St.3d 179,1998-Ohio-281, the Ohio Supreme Court reversed the decision of the appellate court that denied a mandamus claim to a party who wanted to force the Bureau to collect penalties that occurred as a result of violations of the prevailing wage statute. The court held that because there was no option listed in R.C. Chapter 4115 to make an agency collect the penalty or place the contractor on a list of violating companies, appellants could pursue a mandamus claim.
[6] DR 2-106 is a rule from the Ohio Code of Professional Responsibility concerning fees for legal services. The code has since been superseded by the Ohio Rules of Professional Conduct. Prof. Cond. Rule. 1.5 applies to fees and expenses for legal services. The factors listed in both the code and professional rules are virtually identical.
[7] Essentially, Plaintiffs argue that because the trial court had to interpret R.C. 4115.10 in order to determine that the employees were entitled to an award for fees, the court's interpretation regarding those fees is subject to de novo review. However, the trial court awarded fees pursuant to the statute so that the central issue in this assignment of error is not a question of law because Plaintiffs are merely challenging the amount the court granted, not whether the court's interpretation regarding their statutory entitlement was correct. SeeCincinnati City School Dist. Bd. of Edn. v. State Bd. of Edn. ofOhio, 176 Ohio App.3d 678, 2008-Ohio-2845 (using de novo review to reverse the trial court's decision to deny an award for attorney fees because the court misinterpreted a term included in the statute by saying that "organization" located in R.C. 2335.39(A)(2)(d) did not apply to a school district).
[8] See Columbus Invest. Group, Inc. v. Maynard, Franklin App. Nos. 02AP-271, 02AP-418, 2002-Ohio-5968 (reversing attorney fee award because appellant was not responsible for legal fees incurred by appellee in litigating claims relating to other defendants or legal issues not involving appellant).
[9] Counsel submitted post-hearing briefs in lieu of the closing argument. *Page 1